William Allen GOBLE, Plaintiff,

v.

CITY OF SMYRNA, GEORGIA, Defendant.

CIVIL ACTION NO. 1:15–cv–0801–AT

United States District Court, N.D. Georgia, Atlanta Division.

Filed March 31, 2017

Andrew Yancey Coffman, Parks Chesin & Walbert, Atlanta, GA, for Plaintiff.

Tracy Lynn Glanton, Sharon P. Morgan, Elarbee, Thompson, Sapp & Wilson, LLP, Atlanta, GA, for Defendant.

## ORDER

Amy Totenberg, United States District Judge

Plaintiff William Allen Goble was a firefighter who, after disclosing he suffered from Post Traumatic Stress Disorder

("PTSD"), was terminated after more than twenty years of employment with the City of Smyrna Fire Department. Plaintiff argues that he was discriminated against based on his disability in violation of the Americans with Disabilities Act, as amended. 42 U.S.C. § 12101 *et seq.* The matter is currently before the Court on the Magistrate Judge's Report and Recommendation ("R & R") [Doc. 55] that the Defendant City of Smyrna's ("Smyrna" or "City") Motion for Summary Judgment [Doc. 44] be granted. Plaintiff has filed Objections [Doc. 59], the City has filed its Response [Doc. 61], and Plaintiff has filed a Reply thereto [Doc. 62].

## I. OVERVIEW

The Court reviews a Magistrate Judge's R & R for clear error if no objections are filed, and it may "accept, reject, or modify" these findings and recommendations. 28 U.S.C. § 636(b)(1). If a party files objections, the district court must determine de novo any part of the magistrate judge's disposition that is the subject of a proper objection. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b). As Plaintiff filed timely objections to certain findings and recommendations in the R & R, the Court reviews the Magistrate Judge's findings and recommendations in so far as they were objected to on a de novo basis but his findings and recommendations to which no objections posed on a clear error basis.

No objections were made to the following portions of the R & R:

(a) The Magistrate Judge's determination that Plaintiff elected not to pursue claims that he was subjected to illegal fitness-for-duty testing or that he was denied a reasonable accommodation and his recommendation that Defendant's Motion for Summary Judgment be granted as to Plaintiff's ADA and Rehabilitation Act claims that allege a failure to accommodate and illegal fitness-for-duty testing. (R & R at 30–31.)

(b) The Magistrate Judge's determination that Plaintiff has abandoned his claim of retaliation due to his failure to present any evidence or argument in support of that claim in response to Defendant's Motion for Summary Judgment and his recommendation that Defendant's Motion for Summary Judgment be granted as to Plaintiff's ADA and Rehabilitation Act retaliation claim. (R & R at 30–31.)

(c) The Magistrate Judge's determination that Plaintiff failed to make a *prima facie* showing of disability discrimination with regard to his Return to Work Agreement and his recommendation that Defendant's Motion for Summary Judgment be granted as to that claim. (R & R at 43–49.)

(d) The Magistrate Judge's determination that Plaintiff has made out a *prima facie* case that he would not have been terminated but for his PTSD. (R & R at 49–51.)

(e) The Magistrate Judge's determination that, to the extent Plaintiff can demonstrate he is qualified, there would no grounds to grant summary judgment to Defendant on the specific issue of failure to show evidence of pretext. (R & R at 55–56.)

The Court has reviewed these determinations, finds no clear error, and adopts them here. Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment [Doc. 44] as to Plaintiff's ADA and Rehabilitation Act claims for retaliation, failure to accommodate, illegal fitness-for-duty testing, and disability discrimination with regard to his Return to Work Agreement.

Plaintiff has filed objections to the Magistrate Judge's findings and recommendations that (1) Plaintiff was not qualified to perform the essential functions of his job as a lieutenant with the fire department, (R & R at 35–42); (2) Plaintiff cannot rely on his positive performance history in establishing that he was qualified for his position, (R & R at 38–39); (4) undisputed evidence established that Plaintiff demonstrated an "insubordinate refusal to work overtime," (R & R at 51–55); (5) "Defendant was not required to employ a firefighter who was incapable of controlling anger, communicating appropriately with others, and handling stress," (R & R at 53–54); and (6) the decision-maker's consideration of Plaintiff's PTSD was "not inappropriate" when reviewing his alleged insubordination (in relation to the determination that Defendant had legitimate non-discriminatory reasons for termination), (R & R at 54). Plaintiff also asserts that the Magistrate Judge overlooked significant evidence of discriminatory intent in finding that Plaintiff was not qualified and subjected Plaintiff to a higher standard of conduct than other employees who were not similarly disabled.

Based on finding that Plaintiff was not qualified, the Magistrate Judge concluded that Plaintiff had failed as a matter of law to establish a *prima facie* case of discrimination. The Court has reviewed on a de novo basis the record in connection with Defendant's Motion for Summary Judgment on Plaintiff's ADA discrimination claims. Based on its thorough review of the record, the Court finds that material issues of fact exist that preclude entry of summary judgment on Plaintiff's ADA discrimination claim as a matter of law. For the reasons that follow, the Magistrate Judge erred in finding that Plaintiff cannot establish that he is a qualified individual under the ADA and Rehabilitation Act.

## II. FACTUAL BACKGROUND [1]

The Court views the evidence in the light most favorable to Plaintiff as the non-movant and resolves all factual disputes in his favor, as it must on summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The facts [2] before the Court on summary judgment detailed by the Magistrate Judge, are set forth below. Where a dispute of fact is not identified in the R & R or the facts discussed are incomplete, the Court identifies it in the footnotes and below in Section III:

---

1. The Court notes at the outset that it has been unable to reconcile Defendant's citation to the exhibits referenced in its Statement of Material Facts and incorporated by the Magistrate Judge in the R & R. For example, Defendant identifies the July 5, 2013 Letter from Dr. Blue to the City of Smyrna regarding Mr. Goble's treatment for PTSD as Exhibit 10 to Kay Bolick's Deposition. However, the copy of Bolick's deposition filed with the Court does not include an Exhibit 10 (and indeed the index of exhibits indicates the first Exhibit to the deposition as Exhibit 30), nor does it otherwise include as an attachment a copy of Dr. Blue's July 5, 2013 Letter. Dr. Blue's July 5, 2013 Letter is attached to Mr. Goble's deposition as Exhibit 15 (though it is identified in the index as "Composite Exhibit"). (*See* Goble Dep., Doc. 41 at 325.) Defen-

dants also refer to a May, 2014 email from Danny Bruce to Chief Day as Exhibit 18 to Day's Deposition. Again, the copy of Day's deposition filed with the Court does not include an Exhibit 18, and the index of exhibits indicates the first Exhibit to the deposition as Exhibit 38. There is no copy of an email from Danny Bruce to Chief Day attached to Day's Deposition. The email is instead filed as Exhibit 33 to Kay Bolick's Deposition. (*See* Bolick Dep., Doc. 47–1 at 5–6.)

2. Having adopted, for the most part, the Magistrate Judge's fact section, the Court quotes directly from this portion of the R & R. To the extent the Court does not adopt the Magistrate Judge's recitation of the facts, the Court so notes in Section III below.

Plaintiff William Allen Goble began his employment as a firefighter with Smyrna in 1990. Def. SMF at ¶ 1; Goble Dep. [41] at 68. Plaintiff was promoted to Lieutenant around 2007. Def. SMF at ¶ 2; Goble Dep. at 68. As a Lieutenant, Plaintiff's responsibilities included responding to emergency calls for service, supervising assigned personnel, administering firefighter training, and communicating with others to coordinate work activities, review the status of work, exchange information, resolve problems, or give and receive advice and direction. Def. SMF at ¶ 3; Goble Dep. at 77–84, Ex. 7. Plaintiff reported to a Battalion Chief. Def. SMF at ¶ 4; Goble Dep. at 73; Day Dep. [49] at 10–11.

In June 2013, Plaintiff received his annual performance evaluation from his then-Battalion Chief, Eric Farmer. Def. SMF at ¶ 5; Goble Dep. at 99–101; Ex. 11. Farmer's evaluation gave Plaintiff a "2" (Successful Minus/Needs Improvement) in the "Attitude" category and noted that Plaintiff had received a reprimand for insubordination in March 2013. Def. SMF at ¶ 6; Goble Dep. Ex. 11. In the evaluation, Farmer also noted that Plaintiff "has a lot of potential but refuses to engage in the department and lacks commitment" and "at times is disrespectful towards other co-workers and upper management." Def. SMF at ¶ 7; Goble Dep. Ex. 11. Plaintiff disagreed with the evaluation and brought it to Roy Acree, then-Deputy Chief, for further review. Def. SMF at ¶ 8; Goble Dep. at 102–104.

In July of 2013, during Plaintiff's meeting with then-Deputy Chief Acree, or shortly thereafter, Plaintiff told Acree that he had been diagnosed with post-traumatic stress disorder ("PTSD") and asked whether Smyrna could do anything to accommodate him. Def. SMF at ¶ 9; Acree Dep. [48] at 28–31. Acree referred Plaintiff to Human Resources and agreed to reconsider Plaintiff's evaluation. Def. SMF at ¶ 10; Acree Dep. at 21–23, 30–31, 51. Acree later revised Plaintiff's score in the Attitude category from a 2 to a 3, which brought Plaintiff's overall score up to a 3.0 (Successful) from a Successful Minus/Needs Improvement rating. Def. SMF at ¶¶ 11, 83; Acree Dep. at 21–23, Ex. 6; Goble Dep. at 107–10, Ex. 12. This change was made as a "concession" for Plaintiff's PTSD. Def. SMF at ¶¶ 12, 82; Acree Dep. at 51; Goble Dep. Ex. 11.

On or about July 5, 2013, Kay Bolick, Director of Human Resources, received a letter from Plaintiff's treating psychologist, Dr. Richard Blue. Def. SMF at ¶ 13; Bolick Dep. [47] at 32–33, Ex. 10. The letter informed Smyrna that Dr. Blue had been treating Plaintiff for three years for "severe Post–Traumatic Stress Disorder brought on by twenty-three years of service in the fire department" and the treatment had focused on "severe symptoms of anger and rage along with severe depression and anxiety."[3] Def. SMF at ¶ 14; Bolick Dep. at 32–33, Ex. 10. Dr. Blue said his "original recommendation was that [Plaintiff] be placed on full disability. Unfortunately Smyrna was not able to provide adequate insurance coverage for a mental disorder. This left Mr. Goble no alternative but to return to work. The other alternative was no disability and no income." Def. SMF at ¶ 15; Bolick Dep. at 32–33. Dr. Blue recommended that Plaintiff "sit down with management to determine the necessary reasonable accommodations required by law for him

---

**3.** The letter further states that "[c]ompounding the PTSD is the fact that Mr. Goble had a severe heart attack last year [2012]. All of this has added to the tremendous stress level that he has had to endure." (Def.'s Ex. 15 to Goble Dep., Doc. 41 at 325.)

to complete his service." Def. SMF at ¶ 16; Bolick Dep. at 32–33.

On July 12, 2013, Bolick sent a letter to Dr. Blue requesting information about how Plaintiff was limited in the performance of his job so that Smyrna could determine whether any reasonable accommodations could be offered. Def. SMF at ¶ 17; Bolick Dep. at 40–41, Ex. 11. Bolick advised Dr. Blue that Plaintiff works in a "safety sensitive position requiring him to make fast decisions that have life and death implications for himself, co-workers and citizens of the community" and "he needs to be able to respond quickly and fully to instructions from others." Def. SMF at ¶ 18; Bolick Dep. at 40–41, Ex. 11. Bolick also expressed concern that Plaintiff had been released to full duty "notwithstanding [Dr. Blue's] apparent belief that Mr. Goble be on full disability" and said that "[b]ecause you would presumably have not released him to full duty given the potential arising from harm to himself or others, this makes it even more difficult for the City to understand what Mr. Goble's limitations are." Def. SMF at ¶ 19; Bolick Dep. at 40–41. Bolick therefore requested that Dr. Blue identify Plaintiff's limitations so that Smyrna could consider what, if any, accommoda-

tions could be offered. Def. SMF at ¶ 20; Bolick Dep. at 40–41. In response, Dr. Blue emailed Bolick on July 19, 2013, and, instead of identifying Plaintiff's limitations as requested, he recommended that "Mr. Goble's limitations should be addressed directly by him and upper management at the fire department. He knows his job better than anyone given the fact that he has been with the fire department for twenty-three years. Mr. Goble only wants to find a way to reduce the level of stress in his job and this is best served with a meeting of all parties." Def. SMF at ¶ 21; Bolick Dep. at 56–58, Ex. 12.

At this point, Bolick had no information as to any specific ways that Plaintiff's ability to perform his job had been compromised. Pl. SMF at ¶ 14; Bolick Dep. at 45. Bolick did not inquire of anyone at the fire department about Plaintiff's ability to perform his job or about any limitations hampering his performance, and she did not contact Plaintiff to determine what limitations he might have.[4] Pl. SMF at ¶¶ 15–17; Bolick Dep. at 43, 46, 48, 58. Nevertheless, Bolick contacted Defendant's outside legal counsel at the employment defense firm of Ellarbee Thompson. Pl. SMF at ¶ 18; Bolick Dep. at 51–52.[5]

---

**4.** Bolick testified that she took no steps to try to figure out what Mr. Goble's limitations were because she "wanted to get it from his treating physician," despite Dr. Blue's recommendations in his July 5, 2013 letter and his July 19, 2013 email that City management meet with Mr. Goble personally to address his limitations with him and reasonable accommodations to reduce his work-related stress. (Bolick Dep. at 42–43.)

**5.** The Magistrate Judge also noted that "Bolick was aware at this point, however, that Dr. Blue had originally assessed Plaintiff as needing full disability and, despite that, authorized his return to work solely because of a perception that Smyrna's insurance plan was inadequate. Bolick Dep. at 32–33." (R & R at 8.)

However, the citation to the deposition does not support this. Rather, Bolick's testimony relates to her involvement (or lack thereof) in Mr. Goble's termination and that she only became aware of Goble's PTSD after Dr. Blue's July 2013 letter regarding Goble's diagnosis and treatment. (Bolick Dep. at 32–33.) Later, at page 39 of her deposition, Bolick testified when asked whether she had a concern over Dr. Blue's initial recommendation that Mr. Goble be placed on full disability that "That was based on a prior—I believe that had to do with his heart attack scenario ... I believe that original recommendation came out of the following [] his heart attack situation." (Bolick Dep. at 39.) As explained later, Dr. Blue's testimony is consistent with Bolick's recollection that his recommendation

When Smyrna first received information from Dr. Blue that Plaintiff was trying to find a way to reduce his stress, Chief Acree asked Plaintiff whether he would like to transfer out of the lieutenant's position into a driver position. Def. SMF at ¶¶ 22, 77; Goble Dep. at 149–150. Plaintiff declined, believing that would be an "insult." Def. SMF at ¶¶ 23, 78; Goble Dep. at 149–150. Acree acknowledged that "Allen is not the only person that's ever had problems with social interactions" nor was he the only employee given latitude. Pl. SMF at ¶¶ 10, 12; Pl. Resp. SMF at ¶ 24; Acree Dep. at 54, 70. Dr. Blue sent a letter on July 29, 2013 recommending that Plain-

tiff continue to function in his role as Lieutenant (which stemmed from his conversation with Acree about the driver position), that Plaintiff's management/supervisor perform only essential communications with Plaintiff, and that Plaintiff's training requirements be reduced to mandatory state required training only.[6] Def. SMF at ¶ 25; Acree Dep. at 58–61, Ex. 13. Dr. Blue still had not identified Plaintiff's workplace limitations. Def. SMF at ¶ 26; Acree Dep. at 61, Exs. 12, 13.[7] Plaintiff testified that he requested the "accommodation" that management/supervisor perform only essential communications with him because he felt that his supervisor, Farmer, was "harassing" him. Def. SMF at ¶ 27; Goble Dep. at 126, 127, 128.[8]

that Mr. Goble go on full disability was related to the exacerbation of his depression and anxiety as a result of a heart attack. (*See infra* at Section III; Blue Dep. at 47–48, 51–72, 89–92.)

6. The Magistrate Judge also notes that "Dr. Blue testified that Plaintiff wanted to be excused from the additional training because he felt he had worked long enough and did not need 'to do all of these kinds of things.'" Def. SMF at ¶ 28; Blue Dep. [42] at 113–14." (R & R at 9.) Plaintiff objected to the Magistrate Judge's consideration of this testimony as immaterial hearsay that could not be imputed to Mr. Goble. (Pl.'s Resp. SMF ¶ 28.) Plaintiff objects that Dr. Blue's "explanation" was "was not known to Defendant when it terminated Goble and thus could not have formed the basis of that decision." (*Id.*) Dr. Blue clarified his explanation, testifying that physically, Mr. Goble was unable to do training drills. (Blue Dep. at 114.) Mr. Goble testified that he asked for a reduction in training as an accommodation because of the level of stress he was under, not because he just did not want to do it, and that he understood the need for certain training. (Goble Dep. at 127–132.) Mr. Goble further testified that he also asked for training for his supervisors to learn how to deal with his condition (meaning his PTSD), because this was new territory for the fire department. (Goble Dep. at 127, 132.)

7. It is undisputed that Dr. Blue did not identify specific workplace limitations in his written correspondence. He did, however, recom-

mend that fire department management sit down with Mr. Goble to identify the limitations. (Acree Dep. Ex. 11, 12.) No such meeting was held. (Bolick Dep. 42–48, 57–61.) Instead, the City scheduled Mr. Goble for a fitness-for-duty evaluation with Dr. McElroy and required him to submit to the conditions of the Return to Work Agreement drafted by Dr. McElroy. (Bolick Dep. at 61–62, 68–69.)

8. Defendant's citation to Mr. Goble's deposition, as copied over into the R & R, is somewhat incomplete. Mr. Goble testified at p. 144–145 of his deposition that the request that "management/supervisor perform only essential communication," was an attempt to try to limit Plaintiff's dealings with Mr. Farmer. When asked what he considered to be an essential communication, Mr. Goble responded: "Well, if it was a legitimate training or something that he legitimately needed to do. But I could talk to other lieutenants at other substations and I'd say, how many times did Farmer come back to your station today? None. He didn't come by here at all. Well, he came to my station three times today. Why is he coming to my station three times? Because he's looking to get something on me. He's looking to write me up for something or find a problem. You can tell when he walked in the building. He's looking constantly for something. I know I sound like I'm paranoid and crazy, but I'm not. When you're not going to another guy's station and you're coming to mine three times a shift, that's odd." (Goble Dep. at 144–45.)

Because Dr. Blue did not respond to Smyrna's request to identify Plaintiff's limitations,[9] Smyrna sent Plaintiff to a psychologist, Dr. Heather K. McElroy, for a fitness for duty evaluation in an effort to determine Plaintiff's workplace limitations, if any, so that it could consider whether reasonable accommodations could be offered. Def. SMF at ¶¶ 29, 57; Bolick Dep. at 61–62, Ex. 14; Acree Dep. at 115, Ex. 21; Acree Decl. at ¶ 8. At Dr. McElroy's request, Smyrna provided copies of Plaintiff's doctor's notes and information reflecting Plaintiff's disciplinary history. Def. SMF at ¶ 30; Acree Dep. at 115–16, Ex. 23; Acree Decl. at ¶ 9–10, Ex. A. On August 28, 2013, Dr. McElroy issued her report. Def. SMF at ¶ 31; Bolick Dep. at 61–63, Ex. 14; Acree Dep. at 47–49, Ex. 14.

Dr. McElroy reported that Plaintiff was experiencing symptoms of anxiety and depression that included irritability and emotionality, which had exacerbated his difficulties in the workplace, such as difficulty with authority, getting along well with others, and temper problems, and identified Plaintiff's limitations as an inability to appropriately handle conflict and a tendency to exhibit emotionally inappropriate behavior.[10] Def. SMF at ¶ 32; Acree Dep. Ex. 14. She further reported that "[t]he limitations associated with his current mental health symptoms make it difficult for him to conform to the behavioral standards of the department and the requirements of his position." Def. SMF at ¶ 33; Acree Dep. Ex. 14. Based on these limitations, Dr. McElroy concluded that Plaintiff was not psychologically fit for duty, but with certain provisions in place, she believed his symptoms could resolve to a level that would allow him to safely and effectively continue working in his position. Def. SMF at ¶ 34; Acree Dep. Ex. 14.

In an effort to return Plaintiff to work, Dr. McElroy prepared and presented a Return to Work Agreement ("Agreement").[11] Def. SMF at ¶ 35; Goble Dep. at 158–160, Ex. 18; Acree Dep. at 54, Exs. 14, 15. The Agreement contained conditions that Dr. McElroy believed, if agreed to by Plaintiff, would allow Plaintiff to succeed in his job. Def. SMF at ¶ 36; Acree Dep. Exs. 14, 15. The conditions included continuing his counseling sessions; taking any prescribed medications; maintaining emotional control within the work setting; refraining from engaging in physically aggressive behavior or behavior that can be reasonably interpreted as threatening of harm to others; complying with directives issued by his supervisor without resistance or complaint; interacting with others, particularly the public, his super-

9. Dr. Blue did respond to the City's request to identify Plaintiff's limitations on July 19, 2013 and July 29, 2013. As noted above already, Dr. Blue responded by recommending that the City meet directly with Mr. Goble to determine his limitations. Dr. Blue did not refuse to identify limitations as is portrayed by Defendant in its Statement of Material Facts as adopted by the R & R. It appears it was the City that refused to heed his advice based on Bolick's admitted refusal to investigate within the department or speak with Mr. Goble or Chief Acree.

10. Dr. McElroy's report also reflects that Goble's symptoms of depression and anxiety were reported to have become increasingly worse since he experienced a heart attack in 2012. (Ex. 17 to Goble Dep., Doc. 41 at 331.)

11. The fact section of the R & R includes certain contentions by the parties or characterizations of the evidence, as follows: "Plaintiff contends that the Agreement is "focused" on his disciplinary history and conduct at work. Pl. SMF at ¶ 19; Acree Dep. Ex. 15. Defendant acknowledges that the Agreement contains information regarding Plaintiff's disciplinary history and conduct at work, but argues that it is "focused" on the results of the fit-for-duty evaluation. Def. Resp. SMF at ¶ 19." (R & R at 12.)

visors, and fellow firefighters, in a manner that is appropriate, modulated, and respectful and that otherwise meets the standards of the City of Smyrna; conforming without fail to all legal directives communicated by his superiors within the chain of command; and complying with attendance requirements. Pl. SMF at ¶ 29; Def. SMF at ¶ 37; Goble Dep. at 168–172, Exs. 14, 18; Acree Dep. ·at 58–70, Ex. 15. The Agreement also includes provisions that state: "If I am unable to demonstrate compliance to the satisfaction of the Fire Chief, I may be subject to a personnel action that may involve a reduction in rank, separation from the Department or some other outcome to be determined." Pl. SMF at ¶ 28; Ex. 15 at 4. In addition, the Agreement reads "[Plaintiff's] full compliance with these terms is a minimal condition of [Plaintiff] being able to work." Pl. SMF at ¶ 29; Acree Dep. Ex. 15 at 4. The terms of the Agreement also include language requiring Plaintiff to "without fail ... comply fully with ... directive[s], without resistance or complaint and within a timeframe stipulated or implied by the directive or a timeframe deemed reasonable by the person giving the directive." Pl. SMF at ¶ 30; Acree Dep. Ex. 15 at 8.[12]

The Agreement states that the fire department "has determined, based on observations of episodes of conflicts between you and your supervisors and poor decision-making and outbursts of anger/cursing in interactions with others in the fire department, that you may have diminished ability to safely and effectively occupy a Fire Lieutenant position and to otherwise further the mission of the Department." Pl. SMF at ¶ 19; Acree Dep., Ex. 15. At the time Plaintiff disclosed his treatment for PTSD, anxiety, and depression, there was no pending disciplinary action against him. Pl. SMF at ¶ 20; Acree Dep. at 148; Day Dep. at 14. Neither Bolick nor Acree had any plans to require Plaintiff to submit to a fitness for duty evaluation prior to his disclosure of his PTSD diagnosis. Pl. SMF at ¶¶ 21–23; Bolick Dep. at 79; Acree Dep. at 57, 148. The Agreement notes that "the conclusion of the fitness for duty evaluation was that you are currently experiencing symptoms of a diagnosable mental impairment, including difficulty regulating emotion, increased irritability, fatigue, a general sense of being overwhelmed, and a lost [sic] of interest in activities." Pl. SMF at ¶ 25; Acree Dep. Ex. 15 at 2.

Plaintiff had the opportunity to review and propose modifications to the Agreement. Def. SMF at ¶ 38; Goble Dep. at 158–160. Plaintiff claims he was told "if you don't sign it, you don't work here." Pl. SMF at ¶ 27; Goble Dep. at 161. Defendant contends that, though Plaintiff does not state who made this statement[13], it had to have been Dr. McElroy, because Dr. McElroy prepared and presented the Agreement. Def. SMF at

---

**12.** The R & R notes that: "Though Plaintiff claims this is a "zero-tolerance" policy for his failure to comply with directives, Pl. SMF at ¶ 30; Acree Dep. Ex. 15 at 8, Defendant points out that the Agreement provides for an exception if Plaintiff believes compliance would cause an immediate and substantial risk of harm. Def. Resp. SMF at ¶ 30; Acree Dep. Ex. 15." (R & R at 11.) Plaintiff describes the Return to Work Agreement as a "zero-tolerance policy" for his failure to comply with directives because of the Agreement's express language that "... **regardless of whether I intend to formally challenge a di-**

rective, because I understand and agree that, without fail, I will comply fully with the directive, *without resistance or complaint and within a timeframe stipulated or implied by the directive or a timeframe deemed reasonable* by the person giving the directive." (Pl.'s SMF ¶ 30 (quoting Ex. 15, p. 8 (italicized text in original.))). The R & R omits reference to the bolded language, referencing only the language excerpted by Defendant.

**13.** The Court notes that the transcript reflects that counsel for Defendant did not ask Plaintiff who made this statement. (Goble Dep. at

¶ 35; Pl. Resp. SMF at ¶ 35; Def. Resp. SMF at ¶ 27; Goble Dep. at 158–160, Ex. 18; Acree Dep. at 54, Exs. 14, 15. Moreover, Acree and Bolick both testified that they do not know what would have occurred if Plaintiff refused to sign the Agreement. Def. Resp. SMF at ¶ 27; Acree Dep. at 57–58; Bolick Dep. at 75.[14] On October 1, 2013, Plaintiff executed the Agreement and returned to work. Def. SMF at ¶ 39; Goble Dep. at 162–63, Ex. 18.[15]

Paige Day became the Fire Chief in January 2014. Def. SMF at ¶ 40; Day Dep. at 11. Four months into her tenure as Chief, on or about May 21, 2014, she received a report from Battalion Chief Danny Bruce about an incident involving Plaintiff. Def. SMF at ¶ 41; Day Dep. at 38, Ex. 18. Essentially, Bruce, Plaintiff's supervisor at the time, received an email related to a new FLSA schedule for firefighters that was likely to require some overtime work. Pl. Resp. SMF at ¶ 42; Day Dep. at 39–41. Bruce reported that while he was discussing the possibility that Plaintiff would have to work mandatory overtime, Plaintiff protested, stating "they can talk to my fucking attorney I ain't workin [sic] it."[16] Def. SMF at ¶ 42; Pl. Resp. SMF at ¶ 42; Day Dep. at 39, Ex. 18; Goble Dep. at 180. Later, Bruce called Plaintiff to tell him he was up next for overtime, and Plaintiff questioned the accuracy of the records. Pl. Resp. SMF at ¶ 42; Goble Dep. at 31–32. Plaintiff and Bruce then agreed to speak again later. Pl. Resp. SMF at ¶ 42; Goble Dep. at 31–32. Bruce contacted Deputy Chief Acree for guidance, and Acree directed him to pass over Plaintiff and go to the next person in line for overtime. Def. SMF at ¶ 44; Pl. Resp. SMF at ¶ 42; Day Dep. Ex. 18; Acree Dep. at 80–84; Goble Dep. at 31–32. Acree called Goble to tell him he was being removed from the overtime book as an accommodation for his PTSD. Pl. Resp. SMF at ¶ 42; Goble Dep. at 31–32. Plaintiff testified during his deposition that he never asked to be excused from overtime as an accommodation for his PTSD and admits that he could have worked it. Def. SMF at ¶ 43; Goble Dep. at 190. Chief Day was also advised that when Plaintiff found out that another firefighter was going to be held for the overtime since he was refus-

160–161). Plaintiff testified that Acree, Bolick, Dr. Stone and Dr. McElroy were all present at the meeting regarding the Return to Work Agreement. (*Id.* at 161.)

**14.** The Magistrate Judge referred to only this portion of the testimony. Acree's testimony more fully reads: "Q. In other words, he would not have been allowed to return to work unless he had signed this agreement, right? A. I believe that to be true, yes. Well, I don't really know, because he did sign it. Q. So at the time that he signed this, were you aware of what the consequences would have been had he chosen not to? A. We had not discussed consequences. I think that at least from my perception, we were taking one step at a time." (Acree Dep. at 58–59.)

**15.** The Magistrate Judge noted that while Plaintiff did not dispute signing the Return to Work Agreement, Plaintiff added without citing to any evidence in the record, that if he had not signed it, he would not have been allowed to return to work. (R & R at 13, n1.) This is odd because, as reflected just a few lines earlier in the R & R, Plaintiff did in fact testify that he "was told, if you don't sign it, you don't work here," and that he understood if he didn't sign it, he would be terminated. (Goble Dep. at 161.)

**16.** Although Plaintiff does not dispute that Bruce reported this to Day, Plaintiff adamantly denies that this occurred. (Goble Dep. at 186–87.) As set forth below, Plaintiff tells an entirely different version of the events surrounding the "overtime incident" that resulted in his termination. *See infra* at pages 1366–70.

ing to work it, Plaintiff "laughed out loud and said well sucks to be him."[17] Def. SMF at ¶ 45; Day Dep. at 38, 54–55, Exs. 18, 31.

Upon learning about Plaintiff's refusal to holdover for overtime on May 16, Day asked those involved in this incident to summarize what happened in writing. Pl. SMF at ¶ 31; Day Dep. at 53. Bruce sent Day an email summarizing his recollections of the incident, though Plaintiff was not asked to do this. Pl. SMF at ¶ 32; Day Dep. at 53–54. Day met with Eric Taylor, the City Administrator, and Bolick to discuss the overtime incident. Def. SMF at ¶ 46; Day Dep. at 34–35. According to Day, she was told during the meeting "to terminate [Plaintiff] because there was a long history of issues with this employee and they wanted to just get rid of him." Pl. SMF at ¶ 43; Day Dep. at 63. In addition, Day was told during the meeting about Plaintiff's PTSD diagnosis. Pl. SMF at ¶¶ 44–45; Day Dep. at 67, 70. Taylor told Day to "check about this, about PTSD" and that was "the first [Day] really hear[d] about this diagnosis" or about any requests for reasonable accommodation. Def. Resp. SMF at ¶ 45; Day Dep. at 13, 67–68, 70; Pl. SMF at ¶¶ 38, 50. Day understood the "check about this" comment to mean check the Return to Work Agreement to see whether Plaintiff's conduct violated the Agreement. Def. Resp. SMF at ¶ 45; Day Dep. at 67–70; 102. After the meeting, Bolick sent Chief Day a copy of Plaintiff's Return to Work Agreement. Def. SMF at ¶ 47; Day Dep. at 68–70, 83, Exs. 37, 38; Acree Ex. 15.

Ultimately, Day made the decision to discipline Plaintiff. Pl. SMF at ¶ 37; Day Dep. at 35; Bolick Dep. at 17–18, 157.

Chief Day initially wanted to demote Plaintiff, but after speaking with Taylor, who expressed that Plaintiff should be terminated, and reviewing Plaintiff's Return to Work Agreement, which she had not seen before, she agreed that termination was appropriate. Def. SMF at ¶ 48; Pl. SMF at ¶¶ 41–49; Def. Resp. SMF at ¶ 38; Day Dep. at 34–37, 43–44, 58–60, 63, 66–68, 70, 73, 76–77, 84, 103–104, Ex. 44. Day characterized Taylor's directive to fire Plaintiff as "extreme" and indicated she would have demoted Plaintiff, rather than terminating him, absent Taylor's input. Pl. SMF at ¶¶ 46–47; Day Dep. at 76–77. In fact, Day testified that "[t]he biggest impact to change my decision from demotion to separation was the direction I was given from city administration. When I received the documentation, I understood the direction that I was given, and I supported that direction." Def. Resp. SMF at ¶ 49; Day Dep. at 96. Day also testified: "I would not have terminated him. But based on this return-to-work agreement, once I read it, I don't know. I've fired people before because they violated return-to-work agreements. You don't want to fire somebody, but if they can't adhere to the standard, the rules that are set, you have to." Def. Resp. SMF at ¶ 49; Day Dep. at 77.

Bolick testified she "was not aware" that the City Administrator was involved in the decision to terminate the Plaintiff. Def. Resp. SMF at ¶ 38; Bolick Dep. at 18. Further, she testified that Day made the decision to terminate Plaintiff. Def. Resp. SMF at ¶ 38; Bolick Dep. at 157. Day testified that people with disabilities, such as an anxiety disorder, "can't be in the field."[18] Pl. SMF at ¶ 52; Day

---

**17.** Again, Plaintiff does not dispute that Acree was advised that Goble said this, but he denies making the statement as explained more fully below. (Goble Dep. at 192–94.)

**18.** Responding to the question "[W]hat if somebody has a disability, an anxiety disorder that—," Day also testified that, "You can't

Dep. at 50. Defendant contends that, read in context, Day's testimony was that unprofessional conduct could not be accommodated, even when it arises from a disability. Def. Resp. SMF at ¶ 52; Day Dep. at 48–51. Moreover, Day stated that Plaintiff, "unfortunately–and if in fact he did have a clinical diagnosis of post-traumatic stress, he should have not had the responsibility that he had, and really he shouldn't work for the fire department, not because of his post-traumatic stress side, but just because of his behavioral issues. And you just can't behave like that." Def. Resp. SMF at ¶ 53; Day Dep. at 37. Chief Day prepared an initial draft of the termination letter, which was revised by Bolick and then given to Plaintiff. Def. SMF at ¶ 49; Day Dep. at 32–33, 84–85, Exs. 39, 42; Acree Ex. 17. The termination letter states:

> On May 15, 2014 you were informed by ... Danny Bruce, that you were next up for mandatory overtime. At that time, you were directed to report for the May 16th shift. You outwardly refused. This behavior cannot and will not be tolerated. This is considered insubordination and a direct violation of the City's 'Prohibited Conduct' policy and the 'Conformance to Directives' section contained in your Return to Work Agreement, executed on October 1, 2013. After close review of your personnel file, including prior disciplinary notices/actions, it is my recommendation to terminate your employment with the City of Smyrna and the Fire Department, effective June 17, 2014. You have the right to appeal this proposed adverse action.

Pl. SMF at ¶ 39; Ex. 17.

accommodate these people." (Day Dep. at 50.)

The Agreement was the first time that Day became aware of Plaintiff's PTSD and anxiety, and Day referenced Plaintiff's PTSD in the initial draft of the termination letter because Plaintiff violated the Agreement, and it "was written because he had PTSD." Pl. SMF at ¶¶ 50–51; Day Dep. at 13, 92. Day further testified that she referenced the PTSD in her draft letter "[b]ecause the diagnosis didn't matter." Pl. SMF at ¶¶ 50–51; Day Dep. at 92.[19] The letter itself states: "regardless of your diagnosis, your last chance agreement with the City of Smyrna never addressed mandatory overtime. It did, however, address the fact that you understood that insubordination was not tolerated. You directly violated this." Pl. SMF at ¶¶ 50–51; Day Dep. Ex. 39.

Plaintiff appealed Chief Day's recommendation to Taylor in accordance with the City Disciplinary Appeals policy. Def. SMF at ¶ 50; Taylor Decl. at ¶ 5, Ex. C. Taylor met with Plaintiff and his attorney to discuss the proposed termination. Def. SMF at ¶ 51; Taylor Decl. at ¶ 5, Ex. C. Taylor then met with Battalion Chief Bruce. Def. SMF at ¶ 52; Taylor Decl. at ¶ 8. He also reviewed Plaintiff's Return to Work Agreement and documents in Plaintiff's personnel file, including prior reprimands for insubordination and documentation of Plaintiff's history of inappropriate and unprofessional interactions with fellow employees. Def. SMF at ¶ 53; Taylor Decl. at ¶ 6, Exs. D–R. After completing his investigation, Taylor adopted Chief Day's recommendation and terminated Plaintiff's employment on June 19, 2014, for violating his Return to Work Agreement, as well as Smyrna's "Prohibited

19. The R & R erroneously cites to Plaintiff's Statements of Material Fact ¶¶ 50–51, rather than to Defendant's Response to Statement of Material Fact ¶ 51.

Conduct" policy, which prohibits insubordination and various forms of rude and disrespectful conduct. Def. SMF at ¶ 54; Taylor Decl. at ¶¶ 10–11, Ex. T. Plaintiff did not appeal his termination. Def. SMF at ¶ 55; Taylor Decl. at ¶ 11. On July 9, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") more than 180 days after the fitness for duty evaluation in 2013. Def. SMF at ¶ 56; Goble Dep. at 202–203, Ex. 22.

While Plaintiff had a history of insubordination and inappropriate social interactions with co-workers[20], Smyrna was unaware of Plaintiff's PTSD prior to his disclosure in July 2013. Def. SMF at ¶ 58; Acree Dep. at 13–14, 28–32, Ex. 23; Acree Decl. at ¶¶ 4–5, 8, 10, Ex. B–C. Plaintiff also had a history of performance appraisals that Plaintiff contends demonstrate that he was a successful employee. See Pl. Resp. SMF at ¶ 58; Day Dep. at 22 (Goble "looks like a good employee on paper" and "uses judgment based on years of experience. He is able to handle stressful situations with no problems"). Day had not seen these appraisals at the time she chose to discipline Plaintiff. Def. Resp. SMF at ¶ 2; Day Dep. at 11, 18. Plaintiff further contends that he was only occasionally subject to disciplinary actions and that Day did not take either of two written reprimands into account when she chose to discipline Plaintiff. Pl. Resp. SMF at ¶ 58; Day Dep. at 25–26.[21]

According to Plaintiff's performance evaluations, Plaintiff "met expectations" in the areas of decision making, appropriate appearance, dress, conduct, and

20. Plaintiff disputes that he had a "history of insubordination and inappropriate social interactions with co-workers," and objects that this "fact" is conclusory. Defendant relies on the deposition testimony and declaration of Chief Acree. In asking for an assessment of Goble's performance as a firefighter for his 23 years of employment, Acree testified:

Allen was the type of employee, and when I say—I'm not struggling with this, you know, but personally, personal feelings that I have towards Allen and then professional assessment, personal feelings, Allen and I have always gotten along, always been friends, all been cordial to each other. Professionally all the way down to the small details like whether or not an employee is typically late or always on time, Allen is always on time. He was always there. On-scene performance, fire ground performance, EMS calls, from the time Allen had no supervisory responsibilities and up to and including his supervisory responsibilities, we never really had any issues with Allen, with his on the scene performance, the carrying out of his primary responsibilities even when he was, the whole time he was a lieutenant when we were on the fire scene which is not that common, on the EMS scene, always professional, always did

a great job. There were some issues when we were not on the scene. There were issues with just being able to interact professionally with not our customers but internally with employees.

(Acree Dep. at 13–14.) Acree further acknowledged that he had direct knowledge of one incident between Goble and another lieutenant, during which words were exchanged between the two, and at times where there had been issues/disagreements with other employees, other supervisors. (Id. at 14.) In response, Acree requested that Goble be placed under his supervision and, as a result, he never had any issues with Goble during that year and testified that Goble "did great during that time." (Id. at 14–15.) Subsequently, Acree provided a declaration in support of the City's summary judgment motion in which he characterized Goble as "having a long history of personality conflicts with his co-workers and supervisors." (Acree Decl. ¶ 4, Doc. 44–4.)

21. Although the Magistrate Judge couches this as Plaintiff's "contention," Chief Day unequivocally testified that she did not take into consideration in her decision to terminate Plaintiff either (1) a March 26, 2009 written reprimand (characterizing it as just hearsay), or (2) a March 20, 2013 written reprimand. (Day Dep. at 25–26.)

physical fitness during the July 2009–June 2010 period.[22] Pl. SMF at ¶ 3; Ex. 3. Moreover, Plaintiff "exceeded expectations" in the area titled "working under stressful conditions." Pl. SMF at ¶ 4; Ex. 3 at 8. Plaintiff's performance evaluation for the following year was similar, and he received an overall rating of 3.1 out of 5. Pl. SMF at ¶ 5; Ex. 4 at 2. Furthermore, Plaintiff was rated "successful" with a score of 3 out of 5 during the 2011–2012 period. Pl. SMF at ¶ 6; Ex. 5. Finally, Plaintiff's June 2013 appraisal, which was issued just prior to the disclosure of his PTSD, stated that he "uses judgment based on years of experience" and "is able to handle stressful situations with no problems." Pl. SMF at ¶ 7; Day Dep. at 22; Ex. 6. This evaluation was signed off on by Chief Acree and Kay Bolick, the Director of Human Resources. Pl. SMF at ¶ 8; Day Dep. at 24.

Acree testified that Plaintiff's "[o]n-scene performance, fire ground performance" never raised "any issues" and that Plaintiff "was, the whole time he was a lieutenant when we were on the fire scene which is not that common, on the EMS scene, always professional, always did a great job." Pl. SMF. at ¶ 1; Acree Dep. at 13–14. Acree went on to testify that "[t]here were some issues when we were not on the scene. There were issues with just being able to interact professionally with not our customers but internally with employees." Def. Resp. SMF at ¶ 1; Acree Dep. at 14.

The ability to work cooperatively within a chain of command, receive advice and direction from superiors, communicate and get along with others, maintain emotional stability, and manage stress are essential functions of Plaintiff's job as a fire lieutenant. Def. SMF at ¶ 59; Pl. Resp. SMF at ¶ 59; Day Dep. at 78–79, Ex. 15; Acree Decl. at ¶ 11; Goble Dep. at 78–79, 84, Ex. 7. Plaintiff acknowledges the necessity of having a chain of command in the fire service and the important safety purpose that it serves. Def. SMF at ¶ 60; Pl. Resp. SMF at ¶ 60; Goble Dep. at 73–76. Plaintiff's PTSD substantially impairs his ability to communicate and interact with his environment, manage stress, exercise impulse control, and process his emotions.[23] Def. SMF at ¶ 61;

---

**22.** As noted in footnote 2 of the R & R, "Defendant contends that this, and the evaluations from 2010–2012, are irrelevant because Plaintiff's performance in 2009 and 2010 is immaterial to whether he was a qualified individual with a disability in 2013 and 2014, when his PTSD had gotten progressively worse since his diagnosis in 2011. Def. Resp. SMF at ¶¶ 3–6; Goble Dep. at 111–12.

**23.** The Magistrate Judge also relied on testimony of Plaintiff's treating physician, Dr. Blue, as "confirm[ing] that Plaintiff has issues with impulse control and taking directives from his superiors at work, and his symptoms of anger and rage are triggered through his interactions with his superiors. Def. SMF at ¶ 62; Blue Dep. at 30–32, 42–46, 86–87, 95." Plaintiff disputes the materiality of this fact because Dr. Blue's confirmation was not known to Defendant at the time Plaintiff was fired. Pl. Resp. SMF at ¶ 62. The Magistrate

Judge, however, found that the fact is material in determining whether Plaintiff was a qualified individual and considered the testimony for that purpose in his analysis. (R & R at 21, n.3.) Unfortunately the isolated testimony cited by Defendant does not present a complete picture of Dr. Blue's opinions as a result of his history of therapy and treatment of Mr. Goble. Dr. Blue testified his main concerns with Mr. Goble's performance of his duties as a firefighter were related to physical impairments, and the resulting anxiety and depression, due to his heart attack, though he acknowledged that Mr. Goble felt he no longer could function as a firefighter due to his anxiety. (Blue Dep. at 76–77, 89–92, 96.) Dr. Blue also testified that Mr. Goble's PTSD did not pose a safety risk to others, that "Allen knew how to do his job and could do it. I do not think he was a danger to anybody." (Blue Dep. at 95–96, 106.) He later clarified, though, that due to his age and, decades on

Pl. Resp. SMF at ¶ 61; Goble Dep. Ex. 4 at ¶ 9; Blue Dep. at 85–86, 112–13. As examples, in 2009 Plaintiff complained to the Chief about an evaluation because he thought his supervisor was using it as a "form of control or harassment for future punishments and/or termination." Def. SMF at ¶ 63; Goble Dep. at 118–120, Ex. 14. On another occasion, he complained to then-Deputy Chief Acree about a verbal counseling he received for nodding off in a training class because he thought his Battalion Chief was "constantly berating" and "harassing" him.[24] Def. SMF at ¶ 64; Goble Dep. at 61–62; 86–89.

Plaintiff can perceive almost any remark as critical, which leads to a feeling of constant harassment. Def. SMF at ¶ 65; Goble Dep. at 141. When triggered, Plaintiff's PTSD reduces his "ability to cope and handle situations where people [tell] him what to do." Def. SMF at ¶ 66; Blue Dep. at 112–13. Dr. McElroy concluded that Plaintiff's condition creates limitations for him in the workplace, including an "inability to appropriately handle conflict and a tendency to exhibit emotionally inappropriate behavior. As a result, it is difficult for him to conform to the behavioral standards of the department and the requirements of his position."[25] Def. SMF at ¶ 68; Acree Dep., Ex. 14. Dr. Blue agreed with Dr. McElroy's assessment.[26] Def. SMF at ¶ 69; Blue Dep. at 123–24,

the job, and his symptoms of being burnt out, his ability to quickly respond in certain situations would be impaired because "he could not do what young people do as a firefighter." (Blue Dep. at 101). But Goble had no negative history regarding his performance in the field.

24. As noted in footnote 4 of the R & R, Plaintiff objects to both proffered examples inasmuch as Defendant intends to use them to illustrate Plaintiff's PTSD because there is no evidence in the record that these incidents stemmed from Plaintiff's PTSD. Pl. Resp. SMF at ¶¶ 63–64. The Magistrate Judge considered these incidents, "[t]hough not necessarily linked to Plaintiff's PTSD, ... in assessing Plaintiff's ability to work with others and listen to his superiors." (R & R at 22, n.4.)

25. Plaintiff does not dispute that this is Dr. McElroy's conclusion, but contends that "the record of Goble's performance is at odds with this assessment." (Pl.'s Resp. at SMF ¶ 68.)

26. Plaintiff objected to the Magistrate Judge's consideration of Dr. Blue's opinions which were not relied upon by Defendant when it determined what accommodations it would offer Plaintiff or when it terminated him. Plaintiff further objected to the Magistrate Judge's consideration of the following additional specific facts offered by Defendant in support of its Motion for Summary Judgment:

Moreover, Dr. Blue testified that Smyrna could not do anything to accommodate Plaintiff's PTSD symptoms—other than place him in a situation where he would not be made upset. Def. SMF at ¶ 70; Blue Dep. at 95–96, 115, 124–25. Dr. Blue said that the best way to accomplish this would be to instruct Plaintiff's superiors to "leave him alone" and not give him instruction. Def. SMF at ¶ 70; Blue Dep. at 95–96, 115, 124–25.... Plaintiff described to Dr. Blue what it felt like when he got angry, including feelings like: "I'm going to beat his fucking ass." Def. SMF at ¶ 75; Blue Dep. at 74. Plaintiff perceives injustices where others might not and reacts irrationally. Def. SMF at ¶ 76; Blue Dep. at 76.

(R & R at 23.) The Magistrate Judge overruled Plaintiff's objections and considered these facts in assessing whether Plaintiff was a qualified individual. (R & R at 22–24, n. 5, 6, 7.) But Dr. Blue's testimony is somewhat taken out of context. Dr. Blue testified that while Mr. Goble discussed his issues with anger during their therapy sessions, he believed the therapy helped Goble manage his symptoms because to his knowledge Goble "never lost it at work" in the ways he described he feared he would, i.e. by beating up a coworker. (Blue Dep. at 74–75.) Unfortunately, Dr. Blue's testimony, cited by Defendant and as relied on in the R & R, is taken out of context. Dr. Blue testified that Mr. Goble described these feelings to him, but never acted on them as a result of the treatment Dr. Blue provided during their therapy sessions. (Blue Dep. at 74–75.)

Ex. 3. Even when Plaintiff's supervisors communicated work-related, essential information, such as information on an evaluation or reminding Plaintiff of the proper dress code, he became angry. Def. SMF at ¶ 73; Goble Dep. at 61–63.

Plaintiff waited to disclose his PTSD until June 2013 because it had been getting worse, there was an "anger brewing," and he did not want to get pushed to a point where he did something he regretted, such as hitting somebody or cussing them out "to the point where there's no going back."[27] .Def. SMF at ¶ 74; Goble Dep. at 112–13.

Plaintiff's PTSD symptoms, and his anger specifically, were reduced while he was taking his prescribed medication. Def. SMF at ¶ 79; Blue Dep. at 74. Dr. Blue agreed that requiring a commitment from Plaintiff to control his anger or be subject to discipline provided Plaintiff an incentive not to lose control. Def. SMF at ¶ 80; Blue Dep. at 135–36. The fact that the existing requirements of Plaintiff's position were explicit in the Return to Work Agreement was because those were the issues that Plaintiff had been having trouble with and the job requirements that were impacted by Plaintiff's PTSD. Def. SMF at ¶ 81; Acree Dep. at 69–70.

(R & R at 4–24.)

### III. Summary of Disputed Facts

The major disputes of fact on summary judgment relate to:

• Dr. Blue's disability recommendation: Kay Bolick testified she believed Dr. Blue's basis for recommending Plaintiff as needing full disability was related to Mr. Goble's heart attack, not the severity of his PTSD related symptoms (of anger and insubordination) that were impacting his relationships at work. (Bolick Dep. at 39.)

The R & R makes no mention of Plaintiff's heart attack or its implications on Plaintiff's condition, as detailed both by Dr. Blue and Dr. McElroy.

Dr. Blue testified that Mr. Goble's stress level and symptoms of anxiety and depression worsened after suffering a heart attack on April 29, 2012. (Blue Dep. at 47–48.) As a result, in July 2012 Dr. Blue assisted Mr. Goble in seeking disability benefits from his insurer. (*Id.* at 51–69.) At that time, Dr. Blue diagnosed Plaintiff with an anxiety disorder due to his heart attack. (*Id.* at 51; *see also* Blue Dep. Ex., Goble000497.) Dr. Blue indicated Mr. Goble was permanently disabled and that his recent heart attack (and resulting increased stress and anxiety) would not allow him to return to work as a firefighter:

Q. What did you understand were his job duties?

A. Well, the most stressful one was responding to these fires and having to go back out in the field and perform duties of a firefighter, you know, putting out the fire, climbing ladders, going into homes, just dealing with heavy equipment. And, you know, he had a heart attack, so he wouldn't be able to do those kinds of things. Plus, the trauma of dealing with what happens when you're in a fire.

Q. Was that the cause of some of his mental issues, mental stress?

A. Well, Allen loved being a firefighter until—I think the heart attack was major in letting him get in touch with his insecurity about being able to do his job, and that is dealing with all the—the crisis of dealing with a fire and the physical demands it placed on him.

Q. And so when you were recommending that he was permanently disabled from

___

27. Plaintiff testified, however, that he had never acted out like that prior to disclosing

the PTDS, but became concerned after meetings with his doctor. (Goble Dep. at 113.)

his current job, was that a result of his physical condition from the heart attack or was that a result of his mental condition?

A. Physical. He just described being weak. And I mean it made him very depressed that he couldn't do those things anymore.

. . .

Q. So it was your opinion that he was not able to return to his job as a firefighter?

A. Yeah.

. . .

Q. Okay. And then in Section 9, it says, If not, what impairment or loss of function precludes a return to work at this time or the future, question mark? And you wrote, Recent heart attack will not allow patient to return to work as a firefighter, correct?

A. Right.

Q. And then in Section 10, it says, Projected return to work date. And you put, Never in this position.

A. Yeah.

Q. Can you explain why you wrote that?

A. ... That's an interesting point. I just—you know, medically I think that he had been—you know, he had a major heart attack. And I think for what they ask him to do as a firefighter, with a major heart attack, like this he would not be able to do it. It must have been what he was telling me, you know, based on what I heard from him.

. . .

Q. Now, does your license allow you to make a determination about a patient's ability to work based on their physical medical condition?

A. No, not on their physical. It would have to be a mental part of that. There would have to be a mental part. No, it doesn't. I mean that's a medical issue so—

Q. So was there a mental issue that you believed precluded him from—or prevented him—

A. Yeah, his depression and his anxiety, his feelings of worthlessness and—and just the helplessness over his current situation.

Q. And how do you think that that interfered with his ability to return to work as a firefighter?

A. The physical, you know, elements of that made him feel weak and not strong. So that just fed into his insecurity and anxiety and depression. Because all Allen knew how to do really was be a fireman.

Q. Was it your opinion that he was mentally incapable of performing the duties of a firefighter?

A. No. Mentally I think he could do that. I mean—but I think what—the hangup was physically. He just was not able to do these things. He knows how do these—his job.

Q. Okay. So there wasn't a—it wasn't the mental disorders that would have prevented him or interfered with his ability to perform the duties of a firefighter.

A Just—no, other than the—the heart attack triggered his negative thoughts and feelings about it.

. . .

Q. And what was the reason why you checked the box that he was deficient in his psychological, physiological, personal and social adjustment?

A. He expressed a level of depression and inability to cope and a degree of hopelessness about his current situation.

Q. And when you say current situation, you're referring to his physical—[?]

A. Physical.

(*Id.* at 60–68; *see also* Blue Dep. Ex., Goble000497.) After his short-term disabili-

ty benefits ran out a few months later, in September 2012, Dr. Blue recommended Mr. Goble be released back to work on a full-time basis based on his discussions with Mr. Goble that he was mentally fit and to his benefit to return to work. (Blue Dep. at 69–72) ("You know, I did not put to what—what extent he would be a firefighter. I wanted him to go back to work. And I guess he wanted to—you know, what capacity was the issue. I mean maybe a desk job ... You know, it was probably that his disability ran out and he had to go back to work. It was a question of going back to work or lose your job ... I think I really said he—he should go back to work because to not have a purpose would destroy him ... but I know my goal is always to help people get back on the playing field. So I would have wanted him to do anything to give him a purpose. So if he said, I want to go back, fine."). Dr. Blue's statement in his July 5, 2013 letter to the City, regarding his "original recommendation that [Goble] be placed on full disability," was in reference to the 2012 disability claim he submitted on behalf of Mr. Goble following the heart attack. (*Id.* at 89–92.)

To the extent it is properly considered, Dr. Blue's testimony is much more nuanced and complicated than presented in the R & R. His testimony and the evidence surrounding his consideration of Plaintiff's condition following the heart attack in April 2012, as referenced later in the July 2013 PTSD disclosure letter is in dispute. For this reason, the R & R's discussion of Dr. Blue's initial recommendation fails to portray the evidence in the light most favorable to Plaintiff (as later analyzed for purposes of considering Plaintiff's qualification) and mischaracterizes the testimony on the issue. As discussed more fully below in Section IV, the evidence as presented in the R & R on this issue does not support the Magistrate Judge's recommendation that summary judgment be granted in De-

fendant's favor on the issue of Plaintiff's qualification.

● The basis for Plaintiff's request for reduction in training as an accommodation: Mr. Goble testified that he asked for a reduction in training as an accommodation because of the level of stress he was under, not because he just did not want to do it. (Goble Dep. at 127–132.) Mr. Goble further testified that he also asked for training for his supervisors to learn how to deal with his condition (meaning his PTSD). (Goble Dep. at 127, 132.) But the R & R only discusses Dr. Blue's testimony, as offered by Defendant and portrayed in a light unfavorable to Plaintiff. While Plaintiff may have expressed to Dr. Blue his frustrations over the training requirements in light of the length of his time on the job, the evidence viewed in totality also supports the inference that Plaintiff had legitimate reasons for requesting a reduction in training in order to manage his work-related anxiety and stress.

● Whether Plaintiff "voluntarily" executed the return to work agreement versus his understanding that he would be terminated if he did not agree to the terms: The R & R's rendition of the facts seems to unnecessarily question the credibility of Plaintiff's testimony of his understanding of the terms of the agreement that: "I think I understood it. I also knew that it was the groundwork to get rid of me because I knew there was going to be basically no room for error. If I sneezed the wrong way, they were going to fire me. That's what I got from it. But I was also told, if you don't sign it, you don't work here." (Goble Dep. at 160–161.) The Return to Work Agreement expressly provides:

After reviewing the Fitness for Duty Report, the Smyrna Fire Department is hereby willing to afford you an opportunity to maintain your career as Fire Lieutenant

with the Department. However, because you were found to have symptoms of depression and anxiety that interfere with your effectiveness in your position, your return to work will require that there is a a formal, written agreement between you and the City. For you to be able to take advantage of this offer of continued employment, you must comply with the provision that are outlined in the following numbered paragraphs (or as modified as will explained below).

(Ex. 18 to Goble Dep., Doc. 41 at 333.) Construed in Plaintiff's favor, the obvious implications of the terms of the Return to Work Agreement give rise to a reasonable inference that had Goble not executed the agreement he would not have been permitted to continue in his current position as a lieutenant and would have been subjected to some form of adverse employment action, whether it be an involuntary demotion (as originally suggested by Chief Acree and Chief Day) or termination.

● Plaintiff's alleged insubordination and refusal to work overtime during the May 2014 incident: Of critical importance to Plaintiff's Objections are the factual disputes surrounding the R & R's apparent treatment of Mr. Goble's conduct during the May 2014 overtime incident as undisputed. Regarding the facts of the incident, the R & R recounts information reported to Chief Day (1) by Mr. Bruce that Goble "protested" having to work mandatory overtime and responded with a statement that "they can talk to my fucking attorney I ain't working it," and (2) by Mr. O'Bryan that when he informed Goble that another firefighter would be held for the overtime he was refusing to work, Goble "laughed out loud and said well sucks to be him." (R & R at 14 (citing Def.'s SMF ¶¶ 42, 45.)) The R & R then only states that Plaintiff "testified during his deposition that he never asked to be excused from overtime as an accommodation for his PTSD and

admits that he could have worked it. Def. SMF at ¶ 43; Goble Dep. at 190." (*Id.*) But this is not an entirely accurate or complete characterization of the dispute.

Rather, according to Plaintiff, "Goble did not refuse to work the overtime, but did question the accuracy of the records. He and Bruce agreed to speak again later. Meanwhile, Acree, who was then the acting Fire Chief, instructed Bruce to pass over Goble for the overtime assignment. Acree called Goble and told him that he was removing him from the overtime book as an 'accommodation' for his PTSD." (Pl.'s Resp. SMF ¶ 42.) In his deposition, Mr. Goble flatly denied that he ever engaged in the alleged insubordinate conduct. Indeed, Mr. Goble's testimony paints an entirely different picture regarding the events that ultimately resulted in his termination:

Q. Do you recall any conversations in May of 2014 related to mandatory overtime with the chief of police?

A. I was never told I had mandatory overtime. If you're referring to the day that this happened, he called me and it was—and they would do this from time to time, battalion chiefs or a station lieutenant. They would call you and say, hey, I'm just going to give you a heads-up. You're No. 2 in the book or whatever. Or they could use a general term, and this is what Danny did, he just said, hey, you're coming up in the book. So you might want to start making some plans to pick a shift before you get popped. That's what we called it. You get up on Saturday morning and, no, you can't leave. You're it. So that's all he told me, was I was coming up in the book.

Q. And was that the conversation where you said the book is wrong?

A. Yes, because I had—I hadn't been on that shift that long. So with the amount

of overtime we were having at that point, I disagreed. And it was cordial. Nobody was upset. He wasn't upset. I wasn't upset. I just said, I don't really see how I can be at the top of the book already. I hadn't been on this shift that long. And he said, well, you go check your records as to when the last time you worked overtime was and I'll go back and see if I can look through the computer. He said, you look through the computer. And I told him, I said, Danny, I'm not really good with the computer. I won't have a way of finding it that way. But I'll try to come up with something. You look at your records and I'll look at mine. He said, okay. That's fine. We left it that way. Nobody was mad. No threatening. No, hey, don't leave in the morning, you're on the bubble, you better not go, none of that. It was just very cordial.

Q. And did you reconvene to discuss where you were in the book?

A. No.

. . .

Q. In discussing the overtime or your placement in the overtime book or being on the bubble or anything in that context in May 2014, did you ever tell Chief Bruce, talk to my fucking attorney, I ain't working it?

A. No, never happened.

Q. Did you ever say, I ain't working it?

A. No, never happened.

Q. So on May 15, Chief Bruce informed you that you that you were first up for mandatory overtime on the next shift, right?

A. Yes.

Q. You were on the bubble?

A. His terms were, you're coming up in the book, which that could mean one or two or three slots down.

Q. And so how did you respond to that?

A. That's the discussion we had about, I don't believe I'm that high in the book yet. But we agreed to check our records and that's how we left it.

Q. And so was it later during that same shift that you were told to stay over?

A. No.

Q. Was it a later shift when that occurred?

A. No. Actually, about two to three hours later, Chief Acree called me and said what I told you before. I'm taking you out of the overtime book. Basically we gave you no accommodations or anything you've asked for. This is something that's within my power I can do, and that's what I'm going to do. And he did explain to me that, look, Chief Day is out of town. If she wants to change this or revoke it when she comes back, she can, but as for now, this is where we're And I don't foresee her doing that, but if she does, we'll discuss it then. But at that time that was what I was told to do, was not to work the overtime.[28]

Q. So help me fill in the gap here. So you have a conversation with Bruce, you leave it as, you check your record, I'm going to check mine, and next thing you know, you have Chief Acree saying, I'm going to go ahead and take you out?

28. Chief Acree's testimony is consistent with Goble's, that Chief Acree agreed to relieve him of the immediate overtime obligation as an accommodation. (*See* Acree Dep. at 82–84.) Chief Acree acknowledges that Chief Day's termination letter erroneously indicates that Goble was directed to report to the May 16 overtime shift and directly refused because he had removed Goble from the overtime book. He also admits that he was not present for Goble's alleged emotional outburst or using the "f" word and that Chief Day's termination letter makes no reference to the alleged statements. (Acree Dep. at 87–88.) According to Acree, there was nothing wrong with Goble's questioning the accuracy of his place in line for the overtime shift. (*Id.* at 91.)

A. Yes. And I was blindsided because I had no idea that call was coming or—because I never asked for that. I was very appreciative, and I even thanked him repeatedly, thank you so much, because I didn't understand it, but I was very appreciative.

Q. Did you say anything to Chief Bruce about not working it because of your PTSD?

A. No. I had assumed—because Chief Acree and Chief Bruce are at the same station, so I'm assuming those two have communicated with each other that he was told that I was not supposed to work it. I was at a substation. I was away from all that. So I thought that was the end of it as far as that shift.

Q. But I'm confused because prior to then, had there been any discussion about you not having to work the mandatory overtime?

A. I'm not sure what you're talking about.

Q. You said that—I'm trying to figure out when this first notion about you being pulled from the overtime book—

A. It was the same day that Danny [Bruce] called and told me I was coming up in the book. I don't know an exact time. Let's say he called me at 9:00 in the morning. Maybe 1:00 or whatever that afternoon, Chief Acree called me the same day called me, he didn't say, hey, you better not leave in the morning. You're it. You're mandatory overtime. And that's the way it should be handled. If you're going to be mandatory overtime, you're going to be told, hey, don't

leave. You're it, unless somebody else volunteers. That never happened.

Q. So he just told you, look, you're coming up, whatever.• And so if you did not tell him that you weren't working it, then do you have any—because I'm trying to figure out, then, why would Chief Acree call you and say, I'm going to take you off the book?

A. That's why I was blown away. You can ask him. He did it.

Q. So you didn't request to be removed from the overtime book because of your PTSD, correct?

A. No.

Q. And you never requested to be removed from the overtime book, correct?

A. No, I did not.

Q. And if you were told that you were on the bubble and had to stay, you would have stayed, correct?

A. Until Chief Acree told me that, yes.

Q. So Chief Acree calls you and he says, I'm going to go ahead and take you out of the overtime book, but Chief Day may revoke that or put you back into the book?

A. Yes, correct.

Q. So when Chief Acree testified that you called him about not working overtime, was that inaccurate?

A. Yes, that's false.

Q. So you say that was not true?

A. Yes.[29]

Q. At some point during your shift, I guess later during your shift on May 15,

29. Chief Acree did not testify that Plaintiff called him. Rather he testified that after Bruce reported getting some pushback from Goble regarding working the overtime shift, Acree could not remember whether he called Goble or Goble called him. (Acree Dep. at 82, 92–93.) Mr. Bruce's account of the incident, as stated in his May 21, 2014 email to Chief Day tends to supports Mr. Goble's version that it was not Goble who called Chief Acree to discuss the overtime situation. Bruce's email indicates that after Goble protested, Bruce asked Acree how to handle Goble's "refusal" to work overtime and was told by Acree to pass him over. (Ex. 33 to Bolick Dep., Doc. 47–1 at 5.)

you received a call from Lieutenant Kyle O'Bryan, correct?

. . .

A. What is was was the following morning—our shift was from 7:00 in the morning until 7:00 the next morning. So it was like at 6:50—we're fixing to get off—that I got a call request Kyle O'Bryan, yes.

Q. Okay. So part of the same shift that began on the 15th?

A. Yes, you're correct.

Q. But it's now the morning of the 16th, Saturday morning?

A. That's correct.

Q. And you get a call from Lieutenant Kyle O'Bryan. What did he say to you?

A. He said, hey—basically saying I was on the bubble and he had to have me for overtime. And I told him, look, I don't want to go into it. It's a personal matter. And I was referring to the PTSD. And that Roy [Acree] had taken me out of the book. I said, if you have any questions contact Chief Acree, but I really don't want to discuss it with you because it's very personal to me. That place is like a small town. •It's going to—everybody's going to talk about it, if you say something. So I just wanted to keep it very private. And then I got to thinking about it and I thought, well, he may think I was just being a smart ass or whatever. So I called him back and said, look, I just didn't want to leave on a bad note with you or bad foot. This is bigger than what we're talking about. Chief Acree told me not to do the overtime, but, again, I don't care to discuss with it with you.

Q. Do you know whether or not O'Bryan had information from anyone else that you had been removed from the overtime book?

A. I have no way of knowing that.

Q. So if he was following procedure and he had no way of knowing, then he was just doing what was standard practice in terms of calling the person at the front of the book?

A. Yes. But you would think that it would be told by at least Danny, hey, he shouldn't be called in the morning.

Q. What I'm saying is if that communication did not take place—

A. Yes, he was acting properly.

Q. Did he tell you that if you didn't work, then Benzel was going to have to stay over?

A. Yeah, he mentioned something to that regard. And I'm like, there's nothing I can do about that. I don't know what you want me to do. I'm told not to do it from Chief Acree.

Q. Was Benzel one of your subordinates?

A. No.

Q. When he told you that Benzel was going to have to stay over, did you say, sucks to be him?

A. No.

Q. Did you say anything like that?

A. No.

Q. Because he says that you called him back and asked him what he meant when he said he would have to hold Benzel.

A. I don't recall it being that way, but that was a while back. All I was trying to do was not leave a bad taste in his mouth and feel like I was disrespecting him by being coy with him or not telling him everything. I was just trying to be polite. I wasn't trying to—I was trying to avoid a problem.

(Goble Dep. at 180–82, 186–195.)

In his analysis, the Magistrate Judge treats the facts recounted in the R & R regarding Plaintiff's alleged insubordination and refusal to work overtime as established and unrefuted, despite Plaintiff's

testimony to the contrary. These disputed facts were material to the Magistrate Judge's determination as a matter of law that Plaintiff was not qualified and that Defendant's termination decision was justified.

Finally, there is also a dispute regarding the scope of Mr. Goble's negative employment history (incidents of insubordination and inappropriate social interactions with co-workers) as compared with his positive performance evaluations. The dispute appears to arise more out of the parties' and the Magistrate Judge's characterization of the evidence as opposed to what the actual evidence in the record consists of.

In sum, despite the Magistrate Judge's best efforts to present a full picture that accurately portrays both sides of the case, the R & R fails to correctly construe *all* of the evidence in the light most favorable to Plaintiff and fails to draw all reasonable inferences in his favor. Such errors unfortunately bled over into the R & R's analysis and resulted in an improper recommendation that summary judgment be granted in Defendant's favor in the face of genuine material disputes of fact, that if construed by a jury in Plaintiff's favor might lead to a different outcome.

## IV. QUESTIONS OF FACT PRECLUDE THE COURT FROM FINDING AS A MATTER OF LAW THAT PLAINTIFF WAS NOT QUALIFIED

■ Plaintiff objects to the Magistrate Judge's determination that due to his disability and admitted record of insubordination that Plaintiff was unable to perform essential functions of his job and that he put forth no evidence to support the claim that he was qualified.

The Magistrate Judge found that "Plaintiff's admissions and failure to refute the evidence showing that Plaintiff is substantially impaired in his ability to work coop-

eratively within a chain of command, take advice and direction from superiors, communicate and get along with others, maintain emotional stability, and manage stress—all of which Plaintiff admits are essential functions of his job—establish that Plaintiff is not a qualified individual." (R & R at 38.) Specifically, the Magistrate Judge found that Plaintiff admitted: (a) that the "ability to work cooperatively within a chain of command, receive advice and direction from superiors, communicate and get along with others, maintain emotional stability, and manage stress" are essential functions of his job as a fire lieutenant, (R & R at 36, citing Def.'s SMF ¶¶ 59–60); (b) "PTSD substantially impairs his ability to communicate and interact with his environment, manage stress, exercise impulse control, and process his emotions," (R & R at 37, citing SMF ¶ 61; Goble Dep. Ex. 4 ¶ 9); (c) that he can perceive almost any remark as critical, which leads to a feeling of constant harassment, (R & R at 37, citing Def. SMF at ¶ 65; Goble Dep. at 141), (d) that "[w]hen triggered, [his] PTSD reduces his 'ability to cope and handle situations where people [tell] him what to do,'" (R & R at 37, citing Def. SMF at ¶ 66; Blue Dep. at 112–13).

But notably, while Plaintiff admits his PTSD, anxiety, and depression created certain impairments and limitations—there is no evidence that Plaintiff admitted that the identified limitations and impairments manifested in a way that prevented him from performing the essential functions of his job. In fact, in his deposition, Plaintiff expressly denies acting on the anger he felt toward his supervisors as described by Defendant and indicated he was able to manage and control his anger. Construed in his favor, a reasonable fact finder could conclude from Plaintiff's own testimony (and from Dr. Blue's testimony) regarding Plaintiff's symptoms related to his PTSD that for the most part he internalized his

negative feelings rather than acting on them. For example, Plaintiff testified as follows about his anger toward his supervisor Eric Farmer:

Q. So at this time [June 2013] you were having trouble dealing with your supervisor, right?
A. Right.

. . .

Q. And that was because you were under the belief that he was harassing you?
A. Yes.
Q. And what was it about his treatment of you that you were not able to deal with?
A. Well, if every day you came to work and somebody's poking you in the eye trying to make you miserable, it's kind of hard to keep going down that road. Putting it in simplistic terms, that's how I felt.
Q. And the reason why you couldn't deal with it is because of the PTSD?
A. Yes, part of it, because of the anger and the anxiety.• Every time he would—something would happen or we'd have words about something, then that's the way my mind worked, especially I would just overanalyze it to death and get agitated and angry. This is to myself, not with him.

(Goble Dep. at 127–28.)

And the relatively few documented incidents of "insubordination" during Plaintiff's 23 year employment with the fire department would bear this out.

Most importantly, as Plaintiff points out in his Objections and Reply, there is evidence from which a jury could find that any such alleged "insubordination" or other undocumented inappropriate conduct exhibited toward his supervisors was not regarded as either a disqualification or as grounds for termination, until Chief Day learned of Plaintiff's PTSD diagnosis. Following his disclosure of this diagnosis to Deputy Chief Acree, Acree offered Plaintiff a voluntary change in position as a potential way to decrease Plaintiff's work-related stress and anxiety. And prior to her knowledge of Plaintiff's PTSD, Chief Day had only recommended Plaintiff be demoted, not terminated, based on his alleged "refusal" to work overtime. But as Acree testified, prior to her decision to terminate Mr. Goble, Acree informed Chief Day that he had excused Mr. Goble from the May 16 overtime shift and that Goble had not refused to work overtime. (Acree Dep. at 87–88, 94–95.)

The R & R further found that "Plaintiff did not refute Dr. McElroy's conclusion that Plaintiff's condition creates limitations for him in the workplace, including an 'inability to appropriately handle conflict and a tendency to exhibit emotionally inappropriate behavior. As a result, it is difficult for him to conform to the behavioral standards of the department and the requirements of his position.'" (R & R at 37–38, citing Def. SMF at ¶ 68; Acree Dep. Ex. 14). But this is not an accurate characterization of the evidence in the record. Plaintiff did not dispute that Dr. McElroy came to this conclusion, but he did assert that his record of performance was at odds with her assessment. The Magistrate Judge also inaccurately characterized Dr. Blue as agreeing with this assessment. (R & R at 38, citing Def.'s SMF ¶ 69; Blue Dep. at 123–24.) The cited portion of Dr. Blue's deposition contains no testimony that Dr. Blue agreed that Plaintiff was unable to "conform to the behavioral standards of the department and the requirements of his position." Rather, Dr. Blue testified that Dr. McElroy's evaluation that "Goble was currently experiencing symptoms of a diagnosable mental impairment, including difficulty regulating emotion, increased irritability, feeling a general sense of being overwhelmed and a loss of interest in activities" was "consistent with" Dr. Blue's "treatment" of Plaintiff's

PTSD, anxiety, and depression. (Blue Dep. at 123.) Dr. Blue agreed with Dr. McElroy's statement that "[t]hese symptoms *could* significantly interfere with [Goble's] ability to safely and effectively handle the demands of [his] position. And *if left untreated*, [Goble] would be considered to be psychologically unfit for duty." (*Id.* at 124.) But Goble, in fact, was receiving treatment. Thus, contrary to Magistrate Judge's finding, there is evidence in the record, as discussed herein, from which a jury could find that Plaintiff's job performance did not suffer as anticipated by Dr. McElroy. This includes, Plaintiff's job performance following the Return to Work Agreement from October 2013 through May 2014 without incident.

Plaintiff asserts that the Magistrate Judge's analysis ignores the following evidence from which a reasonable jury could find Mr. Goble to be qualified:

(1) Plaintiff's recent history of positive performance assessments, including the June 2013 performance appraisal indicating that Plaintiff "uses judgment based on years of experience [and] is able to handle stressful situations with no problems." (Goble Dep. Ex. 11, Doc. 41 at 302–305.)

(2) Defendant, as recommended by Dr. McElroy, found Mr. Goble qualified because as he could successfully perform his job with certain provisions in place, including proper medication management and consistent mental health treatment. Dr. McElroy found that Mr. Goble's symptoms "may resolve to a level that would allow him to safely and effectively continue to work in his position." (Goble Dep. Ex. 17, Doc. 41 at 330–334.)

(3) Plaintiff's eight months of satisfactory work under the conditions of the Return to Work Agreement un-

til the overtime incident that culminated in his termination by Chief Day despite being relieved from the overtime obligation by Chief Acree. According to Plaintiff, the R & R's finding that Mr. Goble was unqualified because he suffers from the symptoms of his disability despite years of successful employment and a lack of any formal disciplinary record, ignores both the facts of this case and the law.

Plaintiff further asserts that the Magistrate Judge's recommendation is also erroneous because it relied on Mr. Goble's alleged insubordination as a disqualifying factor. As Plaintiff points out in his Objections, the parties disagree that Mr. Goble had a "long history" of acting in an insubordinate manner. But the R & R is silent as to this dispute. Just as troubling, however, is the Magistrate Judge's reliance on Mr. Goble's alleged continued insubordination as indisputably established in finding Goble to be disqualified, and the R & R's portrayal of the evidence in the record as undisputed that Plaintiff violated the Return to Work Agreement by refusing to work overtime and treating his supervisor and co-workers with disrespect in his communications regarding the overtime issue.

Finally, although Plaintiff neglects to point this out himself, the Court finds that the Magistrate Judge clearly erred in relying on "Dr. Blue's medical judgment ... that Plaintiff needed to be placed on 'full disability,'" (R & R at 38, citing Bolick Dep. at 32–33) and in finding that "Dr. Blue offered no information at any time suggesting Plaintiff could actually perform specific tasks and, to the contrary, his opinion that Plaintiff needed to be placed on 'full disability' suggests otherwise." (*Id.*) As detailed extensively in Section III above, Dr. Blue's earlier "full disability" determination was based, not on Plaintiff's PTSD, but on Plaintiff's physical limita-

tions (and resulting increased anxiety and depression) caused by a severe heart attack Plaintiff had suffered two months prior to Dr. Blue's making this recommendation to Plaintiff's insurer in seeking disability benefits. The Magistrate Judge's reliance on Dr. Blue's determination as evidence that Plaintiff was not qualified as a result of his PTSD related symptoms is fatally flawed. In fact, Dr. Blue testified at various times that he believed Plaintiff was capable of performing tasks related to his job as a lieutenant firefighter.

The Eleventh Circuit has specifically rejected, in the Title VII context, the argument that poor performance equates with lack of qualification for a position. The Eleventh Circuit has repeatedly recognized that "if a plaintiff has enjoyed a long tenure at a certain position, [the court] can infer that he or she is qualified to hold that particular position." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Clark v. Coats & Clark*, 990 F.2d 1217, 1227 (11th Cir.1993) (inferring a plaintiff's job qualifications from his 25 years of experience); *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n. 7 (11th Cir. 1983) (finding that "where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy a *prima facie* case, can be inferred"); *see also Bell v. Desoto Mem'l Hosp., Inc.*, 842 F.Supp. 494, 497 (M.D. Fla. 1994) (finding that plaintiff's eight year history of generally satisfactory ratings on his annual performance evaluations is *prima facie* evidence that the plaintiff is qualified). In *Damon*, the Eleventh Circuit concluded that:

> In finding the Appellants unqualified, the district court incorrectly considered Fleming's allegations of Appellants' poor performance. Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong " 'requiring proof of

qualification.' " *Young v. General Foods Corp.*, 840 F.2d 825, 830 n. 3 (11th Cir. 1988) (quoting *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n. 2 (11th Cir. 1987)). We have explained that the " 'reason for this modification [of *McDonnell Douglas* ] is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred.' " *Young*, 840 F.2d at 830 n. 3 (quoting *Rosenfield*, 827 F.2d at 1495 n. 2). We also have unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a *prima facie* case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination. *See Clark*, 990 F.2d at 1227 (holding that evidence of employee's performance reprimands does not establish that employee was unqualified, but may indicate company was legitimately concerned about employee's performance); *Young*, 840 F.2d at 830 n. 3 (same). The district court therefore erred in concluding that Appellants were not "qualified" based on Fleming's allegations of poor performance.

*Damon*, 196 F.3d at 1360.

At the same time, however, in the ADA context, the Court has recognized that an individual's ability to continue performing the essential functions of the job may change or devolve over the course of an employee's tenure. *Holbrook v. City of Alpharetta, Georgia*, 112 F.3d 1522 (11th Cir. 1997). In *Holbrook*, the plaintiff, a police detective, got in a car accident and was rendered unable to drive or collect certain types of evidence due to a visual impairment. *Id.* at 1525. Holbrook argued that his disability would only very infrequently

impact his ability to do his job because crimes that would implicate those disabilities almost never happen in Alpharetta. Judge Birch explained that, even so, "being prepared to respond to unexpected events is, in part, precisely what defines a police officer or detective." *Id.* at 1528. The Court held that even though those particular crimes had not occurred often in the past and may occur only infrequently in the future, Holbrook's inability to perform those essential functions was enough to render him unqualified. *Id.* Holbrook thus recognizes that while an employee may have been qualified at the outset, his qualifications may change and he may lose the capacity to perform the essential functions of the job after incurring a disability.

Here, the evidence is a mixed bag. On the one hand, Plaintiff had a positive performance history for the majority of his 23 years with the fire department, but there is a small record of some interpersonal issues at times with a few co-workers characterized by Defendant on summary judgment as a history of insubordination. On the other hand, in June 2013 following the heart attack months earlier, Plaintiff received his first somewhat negative performance evaluation based on a negative score associated with his attitude and respectfulness. He then disclosed his ongoing treatment for PTSD. Although nothing significant had changed regarding his job performance, the City, seemingly frightened by the disclosure of the PTSD diagnosis, required Plaintiff to submit to a fitness-for-duty evaluation which focused on an alleged record of insubordination. As explained above, the evidence relied on in the R & R is disputed as to whether Plaintiff, in fact, lacked the ability to perform the essential requirements of the job.

 In addition, evidence that a plaintiff has been allowed to continue employ-ment under a Return to Work Agreement is sufficient to establish a *prima facie* case that the employee is qualified for the position. *Robinson v. RockTenn CP, LLC*, 986 F.Supp.2d 1287, 1303 (N.D. Ala. 2013) (noting that although the employer had terminated the plaintiff on more than one occasion during her 10 year employment history, it also allowed her to return to work under last chance agreements, and finding that "[s]uch evidence flies in the face of any argument that [plaintiff] was not qualified for her position").

For these reasons, the Court finds that the Magistrate Judge disregarded certain evidence that would support Plaintiff's claim, failed to view the evidence in Plaintiff's favor, and improperly weighed the evidence against Plaintiff in finding that (a) "Plaintiff's argument that he never had any trouble performing his job while actually on site, along with the argument that he had positive annual evaluations, do not counter the fact that he has admitted that his PTSD impaired his ability to perform essential functions of his job," and (b) "[s]imply because Plaintiff's inability to control emotions, handle stress, or follow commands had not manifested itself in actual problems or dangerous incidents in the field does not mean that Plaintiff was qualified." (R & R at 39.) The Court further finds that the Magistrate Judge improperly concluded that undisputed evidence established that Plaintiff demonstrated an insubordinate refusal to work overtime. As there exist genuine disputes of fact regarding Plaintiff's alleged insubordination (historically and as it related to the overtime incident) as evidence that Plaintiff was unable to perform the essential functions of his job, the Court rejects the R & R's conclusion as a matter of law that Plaintiff was not qualified for his position.

## V. THE R & R ERRED WITH RE-GARD TO CERTAIN FINDINGS RELATED TO PLAINTIFF'S AL-LEGED VIOLATION OF THE RE-TURN TO WORK AGREEMENT AND EVIDENCE RELEVANT TO PRETEXT

Plaintiff also objects to the R & R's treatment of the facts underlying the reason for Plaintiff's termination: that Plaintiff violated the Prohibited Conduct Policy and his Return to Work Agreement by refusing to work an overtime shift and exhibiting insubordination. (R & R at 51.) However, as explained above, material disputes of fact exist regarding whether Plaintiff did in fact engage in conduct that was violative of the City's the Prohibited Conduct policy and Plaintiff's Return to Work Agreement. Thus, because the evidence that Plaintiff refused to work overtime and acted in an insubordinate manner is in dispute, a question of fact also exists regarding whether Defendant's non-PTSD related bases for termination were constituted pretext.

 As in Title VII cases where pretext is an issue, the question the factfinder must answer is whether the employer's proffered reasons were "a coverup for a ... discriminatory decision." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 806, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).) Courts are "not in the business of adjudging whether employment decisions are prudent or fair. Instead, [the] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon*, 196 F.3d at 1361, 1363; *Rojas*, 285 at 1343 (discussing circumstances in *Damon* and noting that where the employer bases termination on employee's poor evaluation, the factual basis for which was in dispute, and concluding that the defense that employee was fired for violation of work rules

was "arguably pretextual when a plaintiff submits evidence ... that she did not violate the cited work rule").

Although the Magistrate Judge ultimately concluded that summary judgment on the issue of pretext was not warranted, in discussing what he described as the "unusual" pretext issue in this case, he found:

At a certain level, it is undisputed that Plaintiff's termination was interrelated with his PTSD. After all, it was Plaintiff's PTSD that led to him being found unfit to work as a firefighter, which then led to his having to sign the Return to Work Agreement. It appears to be at least plausible that his PTSD—and resulting limitations in controlling anger and in interacting with supervisors—likely contributed to if not triggered the insubordination that Defendant relies on. This act in turn constituted a breach of the Return to Work Agreement. Further, a jury could find, based on the chronology of events and discussions between Day and Taylor, that Plaintiff's insubordinate refusal to work overtime would not have in itself resulted in termination for other, healthy, employees.

. . .

The real question, therefore, is whether Day or Taylor were discriminating against Plaintiff because of a condition that was otherwise controllable and subject to accommodation. Because if, instead, they terminated him based on a condition that interfered with job duties in a way that could not be accommodated, that would not violate the ADA. While not put in the most tactful or thoughtful way, Day's statements such as "you can't accommodate these people," do not necessarily suggest anything more than this, *i.e.*, that Plaintiff's PTSD and resulting limitations were

seen as inconsistent with the job duties of a firefighter.

(*See* R & R at 53–55.)

Despite concluding that the evidence "more than supports the inference that [Defendant's] termination decision would not have been made but for Defendant's knowledge of Plaintiff's condition," the Magistrate Judge goes on to state that:

Nevertheless, Defendant was not required to employ a firefighter who was incapable of controlling anger, communicating appropriately with others, and handling stress. Indeed, the entire purpose of the Return to Work Agreement was to attempt to put in place conditions to help allow Plaintiff to meet these requirements and provide a remedy for Defendant if he could not. In this context, it was not inappropriate for Day and/or Taylor to consider Plaintiff's insubordinate act in the broader context of his illness. Isolated misconduct by a healthy person otherwise capable of responding to ordinary workplace discipline may not necessitate termination. But that same misconduct by someone already found to be mentally unfit to serve on the basis of an inability to handle stress, control emotions, and appropriately interact with supervisors, and who has only been allowed to keep working on certain conditions that he could not comply with, may warrant a different response. In other words, Day and Taylor were entitled to consider that Plaintiff's act of insubordination was part of a broader pattern of behavior related to his PTSD, and that he committed the act despite being given the opportunity to continue working pursuant to a Return to Work Agreement.

(R & R at 53–54.) These findings by the Magistrate Judge are based on a flawed view of the evidence of Plaintiff's "insubordinate act" as undisputed.

Moreover, the R & R failed to construe the evidence of Chief Day's discriminatory statement that "you can't accommodate these people," in Plaintiff's favor. A plaintiff also can demonstrate pretext by showing that the decision maker made discriminatory remarks. *See Damon*, 196 F.3d at 1362 (holding that supervisor's statement that he wanted "aggressive, young men" like himself to be promoted was "highly suggestive circumstantial evidence" of age discrimination). "Such remarks are evidence of pretext because they shed light on the decision maker's state of mind at the time that he [or she] made the challenged employment decision. *Ritchie v. Indus. Steel, Inc.*, 426 Fed.Appx. 867, 872–73 (11th Cir. 2011) (citing *Damon*, 196 F.3d at 1362).

The Eleventh Circuit has also held that, even if not direct evidence of discriminatory animus, comments like these "can contribute to a circumstantial case for pretext." *Rojas*, 285 F.3d at 1342–43; *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (1998) (holding that potentially discriminatory comments that were not directly related to the employment decision could contribute to a circumstantial showing of discriminatory intent); *see also Robinson v. RockTenn CP, LLC*, 986 F.Supp.2d 1287, 1308 (N.D. Ala. 2013) (finding supervisor's statement following plaintiff's surgery that "she is not going to be able to work like that," was ample evidence for a reasonable jury to conclude that supervisor who made the ultimate decision to terminate her, regarded her as disabled upon her return to work after her surgery).

Finally, although no specific objection was made, the Court further finds that the Magistrate Judge clearly erred in determining that Plaintiff failed to show that excusing him from overtime was a

reasonable accommodation because it would have necessarily forced Defendant to shift this burden disproportionately on all other firefighters. (R & R at 41.) The Magistrate Judge made this conclusion in determining that Plaintiff failed to identify any reasonable accommodation that would have enabled him to perform the essential functions of his job and therefore be deemed, as a matter of law, to be qualified for his position. However the purported "unfairness" of accommodations entailing reassignment of a minor portion of the duties of a disabled employee where many employees are available to perform such duties does not as a matter of law mean that the accommodation is per se unreasonable. *See Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014). As the Eleventh Circuit discussed more broadly in *Holly v. Clairson Indus., LLC*:

> [T]he very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances-namely, when different treatment would allow a disabled individual to perform the essential functions of his position by accommodating his disability without posing an undue hardship on the employer. Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement. As the Supreme Court has explained:
>
>> [P]references will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, i.e., preferentially. And the fact that the difference in

> treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective."

*Holly v. Clairson Indus., LLC*, 492 F.3d 1247, at 1262–63 (11th Cir. 2007) (quoting *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397–98, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002)).

## VII. CONCLUSION

 In sum, the Court recognizes that the ADA does not require that an employer retain an individual incapable of performing the essential functions of his position and that "there is no requirement under the ADA that an employer tolerate unprofessional behavior for a certain period before it is entitled to discharge an employee." *Owusu–Ansah v. Coca–Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013). But here the record does not unequivocally demonstrate that Mr. Goble could not perform the professional behavior related requirements of his job, and there is a clear dispute in the evidence regarding whether Mr. Goble violated the City's policy and his Return to Work agreement based on continued insubordinate and inappropriate conduct. As a result, the Magistrate Judge erred in finding as a matter of law that Goble was not qualified to perform the essential functions of this job because of his PTSD.

For the foregoing reasons, the Magistrate Judge's R & R [Doc. 55] is **ADOPTED IN PART** and **REJECTED IN PART** and Plaintiff's Objections thereto [Docs. 59, 62] are **SUSTAINED** as stated herein. Defendant's Motion for Summary Judgment [Doc. 44] is **GRANTED IN PART** and **DENIED IN PART**. Defendant's Motion for Summary Judgment [Doc. 44] is **GRANTED** as to Plaintiff's ADA and Rehabilitation Act claims for re-

taliation, failure to accommodate, illegal fitness-for-duty testing, and disability discrimination with regard to his Return to Work Agreement. Defendant's Motion for Summary Judgment [Doc. 44] is **DENIED** as to Plaintiff's ADA and Rehabilitation Act claim for discriminatory termination.

The Court **ORDERS** Plaintiff and Defendant to private mediation. The parties shall advise the Court within work 7 days of the date of this Order if they cannot agree on a private mediator, in which case the Court will appoint one. Mediation shall conclude within 45 days of the date of this Order. In the event mediation is unsuc-cessful, the parties **SHALL** file their Consolidated Pretrial Order within 20 days of the conclusion of mediation. The Court **DIRECTS** the Clerk of the Court to administratively close this case and re-open it upon the filing of the Consolidated Pretrial Order. If the parties resolve the case through mediation, they are **DIRECTED** to file a stipulation of dismissal.

**IT IS SO ORDERED** this 31st day of March, 2017.

